UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LAURA B. HUNT,

                                        Plaintiff,

                -vs-                                                    12-CV-888C

CAROLYN W. COLVIN, Acting Commissioner of
Social Security,[1]

                                        Defendant.

_____

        Plaintiff Laura Hunt initiated this action pursuant to Section 405(g) of the Social

Security Act, 42 U.S.C. § 405(g), to review the final determination of the Commissioner of

Social Security (the "Commissioner") denying plaintiff's application for Social Security

Disability Insurance benefits ("DIB").  The Commissioner has filed a motion for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Item 11)

and plaintiff has filed a cross motion requesting the same relief (Item 12).  For the following

reasons, the Commissioner's motion is granted and plaintiff's cross motion is denied.

## BACKGROUND

        Plaintiff was born on March 20, 1953 (Tr. 127 ).[2]  She applied for DIB on April 16,

2009, alleging disability as of February 10, 2009 due to obesity, diabetes, hypothyroidism,

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Astrue as defendant in this case and no further action need be taken.  *See* 42 U.S.C. § 405(g).

[2]  References preceded by "Tr." are to page numbers of the administrative record, filed by defendant as part of the answer to the complaint (Item 6).

status post hernia repair, cardiomyopathy, abdominal pain, hidradenitis[3], and adjustment disorder with depressed mood (Tr. 157).[4] Plaintiff's application was denied on November 13, 2009 (Tr. 63-66). Plaintiff then requested a hearing, which was held on January 12, 2011 before Administrative Law Judge ("ALJ") Robert T. Harvey (Tr. 29-55). Plaintiff testified at the hearing and was represented by counsel.

By decision dated March 9, 2011, the ALJ found that plaintiff was not under a disability within the meaning of the Social Security Act (Tr. 14-21). The ALJ's decision became the Commissioner's final determination when the Appeals Council denied plaintiff's request for review (Tr. 1-4).

Plaintiff then filed this action on September 19, 2012, pursuant to the judicial review provision of 42 U.S.C. § 405(g). On May 28, 2013, the Commissioner filed a motion for judgment on the pleadings on the ground that the ALJ's determination must be upheld because it is supported by substantial evidence in the record (*see* Item 11). Plaintiff cross-moved for judgment on the pleadings, arguing that the ALJ erred in not finding her disabled (Item 12). The Commissioner filed a response on July 1, 2013 (Item 15), and plaintiff filed a response on July 2, 2013 (Item 16).

---

[3] Hidradenitis suppurativa is a chronic skin condition that features lumps under the skin that typically develop where skin rubs together, such as the armpits and groin. The lumps, which are pea- to marble-sized, are usually painful and may break open and drain foul-smelling pus. www.mayoclinic.org., Diseases and Conditions.

[4] At the hearing, plaintiff amended the alleged onset date to June 27, 2009 (Tr. 31).

## DISCUSSION

### I.  Scope of Judicial Review

The Social Security Act states that upon district court review of the Commissioner's decision, "the findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  Substantial evidence is defined as evidence which "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Tejada v. Apfel*, 167 F.3d 770, 773-72 (2d Cir. 1999).  Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try a case *de novo* or substitute its findings for those of the Commissioner.  *Richardson*, 402 U.S. at 401.  The court's inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner.  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982), *quoted in Winkelsas v. Apfel*, 2000 WL 575513, at *2 (W.D.N.Y. February 14, 2000).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." *Klofta v. Mathews*, 418 F. Supp. 1139, 1141 (E.D. Wis. 1976), *quoted in Gartmann v. Secretary of Health and Human Services*, 633 F. Supp. 671, 680 (E.D.N.Y. 1986).  The Commissioner's determination cannot be upheld when it is based on an erroneous view of the law that improperly disregards highly probative evidence. *Tejada*, 167 F.3d at 773.

3

## II.  Standard for Determining Eligibility for Disability Benefits

To be eligible for DIB and/or SSI under the Social Security Act, plaintiff must show that he or she suffers from a medically determinable physical or mental impairment "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .," 42 U.S.C. § 423(d)(1)(A), and is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Regulations set forth a five-step process to be followed when a disability claim comes before an ALJ for evaluation of the claimant's eligibility for benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, the ALJ must determine whether the claimant is presently engaged in substantial gainful activity.  If the claimant is not, the ALJ must decide if the claimant has a "severe" impairment, which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant's impairment is severe, the ALJ then determines whether it meets or equals the criteria of an impairment found in 20 C.F.R. Pt. 404, Subpart P, App. 1 (the "Listings").  If the impairment meets or equals a listed impairment, the claimant will be found to be disabled.  If the claimant does not have a listed impairment, the fourth step requires the ALJ to determine if, notwithstanding the impairment, the claimant is capable of performing his or her past relevant work.  Finally, if the claimant is not capable of performing his or her past relevant work, the fifth step requires the ALJ to determine whether the claimant is capable of performing other work which exists in the national economy, considering the claimant's

age, education, past work experience, and residual functional capacity.  *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *Reyes v. Massanari*, 2002 WL 856459, at *3 (S.D.N.Y. April 2, 2002); 20 C.F.R. §§ 404.1520(g), 416.920(g).

The claimant bears the burden of proof with respect to the first four steps of the analysis.  If the claimant demonstrates an inability to perform past work, the burden shifts to the Commissioner to show that there exists other work that the claimant can perform. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  The Commissioner ordinarily meets her burden at the fifth step by resorting to the medical vocational guidelines set forth at 20 C.F.R. Pt. 404, Subpart P, App. 2 (the "Grids").[5]  However, where the Grids fail to describe the full extent of a claimant's physical limitations, the ALJ must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).

In this case, the ALJ determined that the plaintiff had not engaged in substantial gainful activity since June 27, 2009 (Tr. 16).  Upon review of plaintiff's medical records and hearing testimony, the ALJ found plaintiff has severe impairments, including obesity, status post hernia repair, hypothyroidism, cardiomyopathy, abdominal pain, and hidradenitis, but that these impairments were not of sufficient severity to meet or equal any of the impairments in the Listings (Tr. 16-17).  The ALJ also determined that plaintiff's diabetes, restless leg syndrome, sleep apnea, and adjustment disorder were not severe impairments because they had only a minimal effect on plaintiff's ability to perform basic work functions.

---

[5]The Grids were designed to codify guidelines for considering residual functional capacity in conjunction with age, education and work experience in determining whether the claimant can engage in substantial gainful work existing in the nation economy.  *See Rosa*, 168 F.3d at 78; *see also Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

*Id.;* 20 C.F.R. § 404.1521.  The ALJ then determined that plaintiff could perform her past relevant work as an invoice clerk (Tr. 20).  Based on these findings, the ALJ determined that plaintiff was not disabled within the meaning of the Social Security Act at any time from June 27, 2009 through the date of the decision.  *Id.*

## III.  The Medical Record

Plaintiff's primary care physician is Dr. Rodolfo Villacorta.  She has treated with him for a variety of ailments, including diabetes, cardiomyopathy, hypertension, high cholesterol, hypothyroidism, restless leg syndrome ("RLS"), and sleep apnea (Tr. 265-82).  In April 2007, she was referred to Dr. Peter Kovacs for a neurologic consultation for RLS.  Plaintiff had a two-year history of RLS, which interfered with her ability to sleep (Tr. 262-63).  Dr. Kovacs increased her dosage of Requip (Tr. 263).  In June 2008, plaintiff's RLS medication was changed from Requip to Mirapex (Tr. 260).  In March 2009, Dr. Kovacs prescribed Ambien for those nights when insomnia was severe (Tr. 259).

In January 2009, plaintiff consulted surgeon Dr. Jeffrey Berndtson regarding a recurrent incisional hernia.  Dr. Berndtson indicated that plaintiff had a history of a dilated heart and would need medical clearance for surgery to repair the hernia (Tr. 213-14).  In February 2009, plaintiff underwent a cardiac stress test (Tr. 218-230).  A nuclear stress test revealed trace apicolateral ventricular ischemia, good work load, mild global left ventricular hypokinesia, and left ventricular ejection fraction of 48% (Tr. 230).  Plaintiff was cleared for surgery.  *Id.*

On February 12, 2009, Dr. Berndtson performed a laparoscopic incisional hernia repair (Tr.210-12).  At a follow-up visit on March 17, 2009, plaintiff was feeling some pain and tenderness, but there was no evidence of hernia recurrence and plaintiff was "doing well." (Tr. 207).  On April 21, 2009, plaintiff was still complaining of abdominal discomfort.  Dr. Berndtson offered a referral to pain management, which plaintiff declined (Tr. 298).  He wrote her a note excusing her from work until May 18, 2009, but stated that "she will have to return to work at that point if she is not having any additional improvement."  *Id.*  On May 12, 2009, plaintiff complained of some discomfort, but was "feeling better" and was "interested in returning to work" (Tr. 481).

Following her surgery, plaintiff began treating with cardiologist Dr. Michael Chaskes (Tr. 441-69).  On July 1, 2009, Dr. Chaskes noted decreased exercise tolerance and difficulty breathing on exertion (Tr. 445).

On July 15, 2009, plaintiff was seen by consultative physician Kathleen Kelley, M.D. (Tr. 341-45).  Dr. Kelley diagnosed diabetes, cardiac disease, hidradenitis, hypertension, obesity, hypercholesterolemia, hypothyroidism, RLS, and multiple hernia repairs (Tr. 345).  She recommended that plaintiff avoid smoke, respiratory irritants, and over exertion.  Additionally, Dr. Kelley indicated that plaintiff would be limited in her ability to bend and twist, lift heavy objects, and push or pull heavy objects.  *Id.*

On July 15, 2009, plaintiff underwent a consultative psychiatric examination by Dr. Rachel Hill, Ph.D. (Tr. 346-50).  Dr. Hill diagnosed an adjustment disorder with depressed mood, but stated that this psychiatric problem does not significantly interfere with plaintiff's ability to function on a daily basis (Tr. 349).  Dr. Hill stated that plaintiff's "greatest difficulties are being caused by her physical problems . . .." *Id.*

7

An echocardiogram on December 7, 2009 indicated a mildly dilated left ventricular end diastolic cavity with mild concentric left ventricular hypertrophy and moderate reduction in left ventricular systolic function and trace mitral regurgitation and pulmonic insufficiency (Tr. 448).  At a follow-up visit with Dr. Chaskes on January 13, 2010, plaintiff had "no complaints" other than fatigue, reported no side effects from her medications, and was "sleeping well," approximately nine hours per night (Tr. 453).

On March 24, 2010, plaintiff had a neurologic follow-up visit with regard to her RLS and insomnia.  Dr. Kovacs reported that plaintiff was "doing well" and that the RLS was "under control."  Plaintiff was "comfortable with the current situation" and would continue Mirapex with occasional use of Ambien (Tr. 400).

Plaintiff underwent two sleep studies, on November 4 and 10, 2010.  Her sleep was abnormal and significant hypoxemia was recorded.  Dr. Anthony Buscaglia recommended the use of a CPAP machine (Tr. 409).

Plaintiff's medical records were reviewed by a state agency psychiatrist.  Dr. Daniel Mangold concluded that plaintiff's depression did not appear to be severe (Tr. 365).

## IV.  Hearing Testimony

At the hearing on January 12, 2011, plaintiff testified that she had to be careful lifting due to her hernia surgery (Tr. 33).  She is fatigued as a result of her hypothyroidism (Tr. 34). She had just begun using a CPAP machine and was getting an average of four to five hours of sleep per night.  *Id.*  She experiences shortness of breath due to her cardiomyopathy and has a hard time walking up a flight of stairs.  *Id.*

8

Plaintiff testified that she experiences infections of the glands in her groin and armpits every three to four weeks, which cause severe pain (Tr. 35). She has had the condition for several years and there is nothing that can be done medically to address it. *Id.* Plaintiff takes medication for depression and to control her diabetes (Tr. 36). She takes several medications and complained of side effects such as dizziness, fatigue, and blurred vision (Tr. 38).

Plaintiff stated that she cannot work because of the hidradenitis (Tr. 39). When she has a boil, she can't move or function (Tr. 43). Plaintiff testified that she does not do housework, but sits, reads and does puzzles (Tr. 40). She naps approximately an hour and a half beyond the time for lunch and breaks in an eight-hour day (Tr. 44). Plaintiff stated that, at the time she left her job in June 2009, she was absent or tardy about six to eight days per month (Tr. 45). She would walk for about a half-hour to relieve the symptoms of RLS (Tr. 46). Plaintiff testified that she can bathe and dress herself, visit friends, and go to church (Tr. 47). She can walk about 100 yards (Tr. 48). If she stands for more than 15 minutes, her right leg becomes numb as a result of diabetic neuropathy. *Id.* She does not have a problem sitting. *Id.*

Vocational Expert ("VE") James A. Phillips testified that plaintiff was formerly employed as a billing typist or invoice clerk, a sedentary, semi-skilled position (Tr. 50). A hypothetical worker with plaintiff's general exertional limitations could perform the past relevant work (Tr. 51-52). If the hypothetical worker had occasional limitations in the ability to perform work activities within a schedule, to maintain regular attendance, and to complete a normal work day or work week because of pain, fatigue, and numbness, such a person would not be able to perform plaintiff's past relevant work (Tr. 53).

**V.  The ALJ's Evaluation of Plaintiff's Residual Functional Capacity**

Plaintiff argues that, in evaluating her residual functional capacity ("RFC"),  the ALJ failed to meaningfully evaluate her ability to sustain work.   Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).   "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*  Here, the ALJ found that plaintiff was capable of performing sedentary work and that this RFC was supported by the objective medical evidence, the nature, extent and frequency of treatment, the plaintiff's testimony regarding her activities of daily living, and opinion evidence (Tr. 20).

Plaintiff does not challenge the ALJ's determination regarding her limitations in sitting, standing, walking, bending, pushing, pulling, and other physical activities, but she contends that the ALJ failed specifically to discuss her ability to work on a regular and continuing basis due to fatigue and painful episodes of hidradenitis.  "[A]n ALJ need not separately discuss a claimant's ability to perform each exertional function, so long as the residual functional capacity determination is set forth with sufficient specificity to permit the court to decide whether it is supported by substantial evidence. *Darby v. Colvin,* 2013 WL 5291113, *4 (Sept. 18, 2013); *Campbell v. Astrue*, 465 F. App'x 4, 6 (2d Cir. 2012)

(summary order) (citing *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).  Here, the ALJ's RFC assessment implicitly included a finding that plaintiff was able to sustain work on a regular and continuing basis and is supported by evidence in the medical record and hearing testimony.

The ALJ noted that none of plaintiff's treating physicians indicated that plaintiff was unable to perform work activities (Tr. 20).  Plaintiff argues that the ALJ was thus under an obligation to develop the record further in this respect, and to elicit an opinion from one of her treating physicians regarding her RFC.  Although the ALJ has an affirmative duty to develop the record, the ALJ is not required to obtain every conceivable piece of information; the Commissioner's conclusion will be sustained if the record contains sufficient evidence to support that conclusion under the applicable standard.  *Rosa v. Callahan*, 168 F.3d at 79 n. 5 ("[W] here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citations omitted).  Here, the administrative record contains several years of treatment notes and records, reports of plaintiff's treating providers, and assessments by consultative examiners.  The record indicates that plaintiff's many physical ailments are largely controlled by medication, including hypertension, high cholesterol, hypothyroidism, and RLS.  Plaintiff had begun to use a CPAP machine for sleep apnea and testified that she was getting four to five hours of sleep per night.[6]  While plaintiff testified that outbreaks of hidradenitis were painful and completely disabling, she explained that she has been living

---

[6]  The court notes that plaintiff reported to Dr. Chaskes in January 2010 that she was getting nine hours of sleep per night (Tr. 453).

11

with the condition for years and that the condition is episodic. CE Dr. Kelley noted that plaintiff was experiencing an outbreak of hidradenitis at the time of her examination, but made no mention of the condition as disabling in her assessment of plaintiff's ability to work (Tr. 345). In fact, Dr. Kelley noted that plaintiff's "most concerning problem at this time is the hernia repair . . ." (Tr. 341). Having reviewed the medical record, the court finds that the objective medical evidence is fully supportive of the ALJ's RFC determination and that the ALJ was under no further obligation to develop the record.

## VI. The ALJ's Credibility Assessment

Plaintiff further argues that the ALJ erred by basing his credibility assessment solely on his own RFC findings. Courts in the Second Circuit have determined a claimant's subjective complaints are an important element in disability claims and must be thoroughly considered. If a claimant's testimony of pain and limitations is rejected or discounted, the ALJ must be explicit in the reasons for rejecting the testimony. *See Brandon v. Bowen*, 666 F.Supp. 604, 609 (S.D.N.Y. 1987). However, subjective symptomatology by itself cannot be the basis for a finding of disability. *Brown v. Colvin,* 2013 WL 3384172, *8 (N.D.N.Y. July 8, 2013). A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529(b), 416.929; *Gernavage v. Shalala*, 882 F.Supp. 1413, 1419 (S.D.N.Y. 1995).

In this case, the credibility determination was required because the ALJ found that plaintiff's statements regarding the intensity, persistence, and limiting effects of her

symptoms were not substantiated by the objective medical evidence (Tr. 17).  The medical record reflects that plaintiff's RLS is under control and that she was sleeping better with the aid of a CPAP machine.  Other conditions, such as diabetes, high cholesterol, hypothyroidism, and hypertension were similarly controlled by medication.  There is no mention of plaintiff's hidradenitis in the medical records from plaintiff's treating physicians, and no mention of its severity or limiting effects in the CE's assessment of plaintiff's ability to work.  The medical record reveals examinations within normal limits, and no mention of disabling pain or fatigue.

Having found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, the ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible (Tr. 18).  The ALJ noted that plaintiff suffered from hidradenitis for many years, but was able to work successfully in a sedentary position during that time despite the allegedly painful boils she experienced every three to four weeks (Tr. 16).  While plaintiff testified of fatigue, she stated that she was able to bathe, dress herself, go to church, visit friends, do light housework, shop with her husband, watch television, and do puzzles. Upon a review of the record, the court finds no reversible error in the ALJ's evaluation of plaintiff's credibility.

## CONCLUSION

The Commissioner's determination that plaintiff is not disabled is supported by substantial evidence in the record.  The Commissioner's motion for judgment on the

pleadings (Item 11) is granted and the plaintiff's cross motion (Item 12) is denied.  The clerk of the Court is directed to close the case.

So ordered.

_____
\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:   February 12   , 2014

14